ANN KANOELEHUA OTTEMAN
Attorney-at-Law *A Legal LLC*
66-126A Awai Ln.
Haleiwa, HI 96712
Phone: (808)382-6758
Email: ann@ottemanlaw.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| **KENNETH A. KALAMA,** an individual, **EDWARD MAIAVA, JR.,** an individual<br><br>Plaintiffs,<br><br>v.<br><br>**BRIGHAM YOUNG UNIVERSITY-HAWAI'I,**<br><br>Defendant. | Civil No.<br><br>**COMPLAINT & EXHIBITS A & B**<br><br>**JURY TRIAL DEMANDED** |

COMPLAINT

Plaintiffs Kenneth A. Kalama ("Mr. Kalama") and Edward Maiava, Jr. ("Mr. Maiava"), by and through their undersigned counsel, hereby file this Complaint against Defendant Brigham Young University-Hawaii ("BYU-Hawaii" or "Defendant"), and allege as follows:

## I. JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights), 42 U.S.C. §

2000e-5(f)(3) (Title VII), and 29 U.S.C. § 626(c) (ADEA). This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

2. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District, Defendant conducts substantial business in this District, employment records are maintained for Defendant and Plaintiffs would have worked in the State of Hawai'i but for the wrongful terminations.

3. Prior to filing this action, Plaintiffs exhausted their administrative remedies by timely filing charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Plaintiffs received Notices of Right to Sue from the EEOC, copies of which are attached hereto as Exhibits A and B. This Complaint is filed within ninety (90) days of Plaintiffs' receipt of their respective Right to Sue letters.

## II. PARTIES

4. Plaintiff Kenneth A. Kalama is an individual residing in the State of Hawaii.

5. Plaintiff Edward Maiava, Jr. is an individual residing in the State of Utah. At the time of the employment and subsequent wrongful termination, he was a long-time resident of the State of Hawai'i. His change in residence was a direct result of the wrongful termination.

6. Defendant Brigham Young University-Hawai'i is a private educational institution with its principal place of business in Laie, Hawai'i. BYU-Hawai'i is an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b), the Age Discrimination in Employment Act, 29 U.S.C. § 630(b), and Hawai'i Revised Statutes § 378-1, employing fifteen or more employees for each working day in each of twenty or more calendar weeks.

7. At all times relevant to this Complaint, Defendant was Plaintiffs' employer and exercised control over the terms and conditions of Plaintiffs' employment, including the decision to terminate their employment.

## III. FACTUAL ALLEGATIONS COMMON TO BOTH PLAINTIFFS

### A. Plaintiffs' Protected Status

8. Both Plaintiffs are members of multiple protected classes under federal and Hawai'i state law.

9. Both Plaintiffs are Native Hawaiian and/or Pacific Islander, constituting a protected racial and cultural class under Title VII and Hawai'i Revised Statutes § 378-2.

10. Both Plaintiffs are over the age of forty (40), constituting a protected class under the Age Discrimination in Employment Act and Hawai'i Revised Statutes § 378-2.

11. Both Plaintiffs are highly regarded members of their cultural and church communities in and beyond the State of Hawai'i.

### B. Plaintiffs' Exemplary Employment Performance

12. Both Plaintiffs were long-time employees and devoted servants to the mission of BYU-Hawai'i.

13. Both Plaintiffs were highly valued by Defendant, excelled in their roles, and provided exceptional value to the institution and its students.

14. Throughout their employment, both Plaintiffs received consistently positive annual performance reviews, high performance ratings, merit-based salary increases, bonuses, awards, and other recognition for their exemplary service.

15. When salary increases and bonuses were awarded to Plaintiffs, BYU-Hawai'i made clear that they were the result of Plaintiffs' outstanding performance, warranting promotions and increased responsibility.

16. Both Plaintiffs quietly and professionally absorbed additional roles and responsibilities as departments were restructured and as other employees left positions that were not backfilled by BYU-Hawai'i.

17. Both Plaintiffs regularly requested—but never received—greater clarity regarding the scope of their roles and responsibilities, specific performance metrics, milestones, or goals that needed to be achieved.

18. Both Plaintiffs worked significantly in excess of a 40 hour work week, often working weekends and evenings in addition to the regular work week.

19. Neither Plaintiff was ever advised by their supervisors that their performance failed to meet or exceed expectations prior to their respective terminations.

20. At no time during their employment were either Plaintiff counseled, warned, placed on probation, or given any indication that their employment was in jeopardy.

21. Students and colleagues who worked with Plaintiffs uniformly praise their dedication, professionalism, and contributions to BYU-Hawai'i.

**C. Plaintiffs' Unlawful Terminations**

21. Despite their exemplary performance, both Plaintiffs were terminated from their employment by BYU-Hawai'i in 2024.

22. Plaintiffs' terminations were sudden, unexpected, and inconsistent with BYU-Hawai'i's publicly expressed policies, procedures, and values.

23. BYU-Hawai'i's stated reasons for Plaintiffs' terminations were pretextual, inconsistent with one another, and contradicted by Plaintiffs' employment histories, performance reviews, awards, annual appraisals, and merit increases.

24. Oral and written communications from BYU-Hawai'i leadership regarding the basis for Plaintiffs' terminations were not consistent with one another and were entirely contradicted by the documented evidence of Plaintiffs' exemplary performance.

25. Upon information and belief, BYU-Hawai'i's direct leadership were not truthful about the reasons for Plaintiffs' terminations and invented performance-based justifications to conceal the real, unlawful discriminatory reasons.

26. BYU-Hawai'i ignored its own publicly shared discipline and termination procedures with respect to Plaintiffs.

27. BYU-Hawai'i provided no verbal counseling sessions, no written warnings, no additional warnings or probation periods, and no discussions of lateral reassignments to either Plaintiff prior to termination.

28. BYU-Hawai'i's failure to follow its own progressive disciplinary procedures was deliberate and designed to prevent the creation of a paper trail that would expose the discriminatory nature of Plaintiffs' terminations.

29. Prior to their terminations, both Plaintiffs had been assured by their supervisors and BYU-Hawai'i leadership that they would be able to retire from BYU-Hawai'i and had made life and financial decisions in reliance on those representations.

30. Plaintiffs felt blindsided by their terminations, which were contrary to the values and standards of honesty and integrity that BYU-Hawai'i publicly espouses and that had been repeatedly communicated to Plaintiffs throughout their employment.

31. Upon information and belief, Plaintiffs were terminated because of their race, cultural background, and age, in violation of federal and state law.

32. Upon information and belief, Plaintiffs assert that BYU-Hawaii Leadership privately concluded that Plaintiffs – because they were Native Hawaiian and Pacific Islander's – were less desirable that white persons from the mainland USA for leadership. Specifically, BYU-Hawai'i leadership admitted they did not want Plaintiffs to be "the face of BYU-Hawai'i".

33. Thus, other employees who were not members of Plaintiffs' protected classes were treated more favorably than Plaintiffs, given more meaningful leadership opportunities (as opposed to token "yes man" leadership roles) and were not subjected to termination under similar circumstances.

34. Upon information and belief, BYU-Hawai'i has engaged in a pattern and practice of discriminatory employment practices against Native Hawaiian and Pacific Islander employees.

35. Upon information and belief, this is not the first time BYU-Hawai'i has unlawfully terminated Native Hawaiian or Pacific Islander employees under pretextual circumstances.

36. The economic and emotional hardships caused by Plaintiffs' wrongful terminations have been severe and continue to this day.

37. Both Plaintiffs roles at BYU-Hawai'i were secular and non-ministerial, each were employed as non-faculty operational employees as well as acting dually as adjunct faculty.

## IV. FACTUAL ALLEGATIONS SPECIFIC TO PLAINTIFF KENNETH A. KALAMA

38. Mr. Kalama was employed by BYU-Hawai'i for over eight (8) years.

39. Mr. Kalama served in many roles during his employment with BYU-Hawai'i, including as Career Services Manager, and assisted with other positions that remained unfilled even though his titled position was that of Career Services Manager.

40. Throughout his eight years of employment, Mr. Kalama's employee personnel file shows consistently positive annual performance reviews, high performance ratings, and merit-based salary increases.

41. When salary increases were awarded to Mr. Kalama, BYU-Hawai'i made clear in writing and through oral communications, documented in positive performance reviews, that they were the direct result of his exemplary performance, warranting promotions and increased responsibility.

42. Mr. Kalama began his career at BYU–Hawai'i in Purchasing in 2007 returned to Career Services in 2016 more than a decade ago and was promoted from a Relationship Manager to the Manager of Career Services.

43. Under his leadership, the department was built and designed with approval from the ground up as part of what was originally called the Ho'okele department, establishing a structure, partnerships, and programs with global partners that still exist today.

44. Mr. Kalama's work focused on culturally attuned student support for a diverse U.S., Hawai'i, Pacific, and Asian student body—precisely the population BYU-Hawaii claims to serve.

45. Over his years of service to BYU-Hawai'i, Mr. Kalama maintained hundreds of professional networks across the Asia-Pacific, Hawaii, and U.S. regions, brought employers, graduate school, and government officials to campus, increased internship and job-placement outcomes, and personally mentored thousands of students as to their professional careers.

46. Mr. Kalama developed the “Career Studio” which recorded more than 9,000 positive student engagements, consistently high satisfaction ratings, and measurable alumni success (70% average placement rate among graduating students).

47. Mr. Kalama also won the “Big Shoes to Fill” award, an acknowledgment from those within our extended area under BYU-Hawaii’s VP, as well as encouragement and support for the APCC conference that he also co-founded.

48. Mr. Kalama’s international travel was repeatedly approved through the summer 2024, and the Asia Pacific Career Conference (APCC) 2024 that he led received full institutional support and budgetary approval from BYU-Hawai’i.

49. In his eight years of employment at BYU-Hawaii’, Mr. Kalama was never provided any specific performance metrics, milestones, or goals that needed to be achieved, despite repeatedly asking for such guidance.

50. Mr. Kalama's requests for clear performance metrics and goals were made both orally in meetings with his supervisors and in writing through email communications.

51. BYU-Hawai’i's failure to express dissatisfaction or performance shortcomings, or, provide Mr. Kalama with performance metrics or goals made it impossible for him to know what standards he was expected to meet or alert him as to any alleged deficiencies in his performance.

52. Mr. Kalama was never counseled, warned, or placed on probation prior to his termination.

53. Mr. Kalama's termination was unexpected and completely inconsistent with his documented performance history and the representations made to him by BYU-Hawai’i leadership.

54. At the time of his termination, Mr. Kalama was led to believe that BYU-Hawai'i was inventing performance-based reasons to justify a termination decision that had already been made for unlawful, discriminatory reasons.

## V. FACTUAL ALLEGATIONS SPECIFIC TO PLAINTIFF EDWARD MAIAVA, JR.

55. Mr. Maiava was employed by BYU-Hawai'i beginning in 2015, a period of approximately nine (9) years.

56. Mr. Maiava worked directly with his supervisor, James Faustino ("Mr. Faustino"), throughout his employment at BYU-Hawai'i.

57. Mr. Maiava and Mr. Faustino had bi-weekly scheduled one-on-one meetings throughout the last nine years of Mr. Maiava's employment.

58. Despite these regular, recurring meetings over a nine-year period, Mr. Faustino never once advised Mr. Maiava that his performance failed to meet or exceed expectations.

59. In 2021, Mr. Maiava received the prestigious Napua Baker Management Award in recognition of his outstanding management abilities and exceptional contributions to BYU-Hawai'i.

60. The Napua Baker Management Award is one of BYU-Hawai'i's highest honors for management excellence and is awarded only to employees who demonstrate extraordinary leadership, dedication, and service.

61. In 2022, Mr. Maiava was awarded bonus compensation for his excellent work.

62. In 2023 and 2024, Mr. Maiava received excellent annual performance reviews from BYU-Hawai'i.

63. In April 2024, Mr. Maiava received another compensation bonus for excellent work, which included a significant raise in salary.

64. The April 2024 raise was substantial and was expressly tied to Mr. Maiava's outstanding performance and value to BYU-Hawai'i.

65. In early May 2024, Mr. Faustino attended a meeting with BYU-Hawaii leadership, including individuals with knowledge of this matter, where Mr. Faustino advocated for Mr. Maiava's promotion.

66. At that May 2024 meeting, Mr. Faustino stated, "Eddie is my right-hand man, and I cannot do my job without him."

67. Mr. Faustino's statement in May 2024 reflected Mr. Maiava's indispensable role and exceptional value to BYU-Hawaii'.

68. Mr. Maiava was awarded BYU-Hawai'i housing as further evidence of the institution's commitment to him and his family in recognition of his excellent service.

69. The awarding of BYU-Hawai'i housing is a significant benefit that signals the institution's long-term commitment to an employee and is reserved for highly valued employees.

70. Mr. Maiava and his family relied on BYU-Hawai'i's provision of housing and made significant life decisions based on this benefit, selling their home to relocate to Hawai'i based BYU-Hawai'i's promise of housing.

71. Despite his repeated requests for greater clarity regarding the scope of his role and responsibilities, Mr. Maiava never received specific performance metrics, goals, or milestones. He only received excellent performance reviews.

72. Mr. Maiava's requests for clarification, insights on how to improve his already exemplary performance were made orally and in writing throughout the course of his employment.

73. BYU-Hawaii failed to alert Mr. Maiava of any performance shortcomings prior to his termination, and, made it impossible for him to address any alleged deficiencies due to BYU-Hawaii's failure to provide any milestones or metrics for defining those expectations.

74. Mr. Maiava was never counseled, warned, or placed on probation prior to his termination.

75. Mr. Maiava was never given any indication that his employment was in jeopardy or that BYU-Hawaii was dissatisfied with his performance.

76. Mr. Maiava's termination in 2024 was sudden, unexpected, and completely inconsistent with his documented exemplary performance and the representations made to him regarding his value to BYU-Hawaii.

77. The timing of Mr. Maiava's termination—coming just months after he received a significant raise, a bonus, housing, and Mr. Faustino's emphatic endorsement for promotion—strongly suggests that the stated reasons for termination were pretextual and that the true reasons were unlawful.

## VI. DAMAGES

78. As a direct and proximate result of Defendant's unlawful and discriminatory conduct, Plaintiffs have suffered and continue to suffer significant economic damages, including but not limited to:

a. Lost wages, salary, and benefits from the date of termination to the present;
b. Lost future wages, salary, and benefits;
c. Loss of retirement benefits and pension contributions;
d. Loss of health insurance and other employee benefits;
e. Loss of BYU-Hawaii housing (as to Mr. Maiava);
f. Other economic losses.

79. As a direct and proximate result of Defendant's unlawful and discriminatory conduct, Plaintiffs have and continue to suffer significant non-economic damages, including but not limited to:

a. Emotional distress, humiliation, and mental anguish;
b. Loss of reputation and professional standing in their communities;
c. Damage to personal and professional relationships;
d. Loss of enjoyment of life;
e. Anxiety, depression, and other psychological harm;
f. Physical manifestations of emotional distress.

80. Plaintiffs have been forced to seek alternative employment at reduced compensation and with inferior benefits.

81. Plaintiffs have incurred out-of-pocket expenses as a result of their terminations, including costs of obtaining health insurance, job search expenses, legal fees and expenses, forced relocation and other necessary expenditures.

82. The discriminatory conduct of Defendant has caused Plaintiffs to suffer a loss of faith and trust in BYU-Hawaii as an institution and has damaged their standing in the Native Hawaiian and Pacific Islander communities.

83. Mr. Maiava seeks recovery of all wages and benefits lost due to his unlawful and discriminatory termination for a period of six (6) years, including salary, raises, bonuses, and employment benefits. This includes retirement-related losses such as employer-sponsored 401(k) contributions and matching benefits.

84. Mr. Maiava asserts lost back pay in an amount no less than $630,000.00, plus retirement contributions from BYU-Hawaii in an amount to be established a trial.

85. Mr. Maiava also seeks front pay to compensate for diminished earning capacity and career disruption extending to retirement age. BYU-Hawaii's illegal actions caused loss of

retirement eligibility and long-term financial security, including loss of pension accrual and reduced Social Security benefits in an amount no less than $500,000.

86. As a direct and a known consequence of the unlawful termination to BYU-Hawaii, Mr. Maiava lost employer-provided housing, resulting in forced displacement and substantial hardship. Damages include increased housing costs, relocation expenses, and loss of housing stability and community.

87. These harms were exacerbated by the high-cost and limited housing market in the State of Hawaii which augmented Mr. Maiava's damages by an amount no less than $1,500,000.00.

88. Mr. Kalama seeks lost wages, salary benefits from the date of the termination forward in an amount to be proven at trial but in no event any less than $400,000.00.

89. Mr. Kalama also seeks front pay to compensate for diminished earning capacity and career disruption extending to retirement age. BYU-Hawaii's illegal actions caused loss of retirement eligibility and long-term financial security, including loss of pension accrual and reduced Social Security benefits in an amount no less than $1,000,050.00.

90. Plaintiffs reserve the right to amend these amounts as discovery progresses in this matter.

## FIRST CAUSE OF ACTION
## Race Discrimination in Violation of Title VII of the Civil Rights Act of 1964
## 42 U.S.C. § 2000e et seq.
## (On Behalf of Both Plaintiffs)

91. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

92. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., prohibits employers from discriminating against employees on the basis of race, color, national origin, religion, or sex.

93. Specifically, Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

94. Both Plaintiffs are Native Hawaiian and/or Pacific Islander, a protected racial and ethnic class under Title VII.

95. Plaintiffs' Native Hawaiian and Pacific Islander heritage is a fundamental part of their identity and is well-known to BYU-Hawaii.

96. Plaintiffs were qualified for their positions and were performing their jobs in an exemplary manner, as evidenced by consistently positive performance reviews, awards, bonuses, salary increases, and other recognition.

97. Despite their exemplary performance and qualifications, Plaintiffs were terminated from their employment.

98. Defendant's stated reasons for Plaintiffs' terminations—alleged performance deficiencies—were pretextual and designed to conceal the true, discriminatory reasons for their terminations.

99. The discriminatory actions that harmed these Plaintiffs did not occur in isolation, or in a vacuum.

100. Plaintiffs' allegations and this complaint filed by two long-serving members of the BYU–Hawaii community illustrate the broader discriminatory culture of hostility, favoritism, intimidation, and disregard for fairness that has developed under the current leadership.

101. Plaintiffs have received and will share as part of this litigation, a multitude of similar stories suffered by others in their community where discriminatory policies, poor

management and bigotry advanced at BYU-Hawaii because so many who shared Plaintiffs cultural community and race feared reprisals and retaliation.

102. Plaintiffs are secular, operational non-faculty members but the discriminatory culture undermining BYU-Hawaii's publicly expressed, posted policies impact the faculty as well. Plaintiffs have knowledge of former professors – faculty members - that were terminated, forced out, or intimidated and chose to leave because of BYU-Hawaii's discriminatory culture, their inconsistent and illegal treatment of Plaintiffs racial and culture community members employed at BYU-Hawaii.

103. Others, Senior Missionaries, left BYU-Hawaii concerned, disappointed, and disgusted with its' leadership describing a complete absence of "aloha" and "kuleana" from the President's Council.

104. Despite being devout followers of the LDS faith, missionaries serving BYU-Hawaii's "higher calling", the shameful discriminatory culture permeated and tainted their experience, caused them to feel unappreciated, discredited, less than worthy.

105. Entire internal departments employing those sharing racial and cultural heritage with Plaintiffs were dismissed as unimportant, made to feel "less than" their white counterparts from the mainland and leadership from Utah.

106. BYU-Hawaii has had prior written notifications of its' discriminatory culture, the devaluing of those sharing Plaintiff's racial heritage and local community ties via its' Church Board of Education.

107. BYU-Hawaii and its Church Board of Education (closely affiliated and operating under the same leadership) learned in the years prior to Plaintiffs terminations that BYU-Hawaii was effectuating a pattern of faculty dismissals and CFS (continuing faculty status)

denials that contradicted peer-review recommendations, were driven by "excessive race-based and other political initiatives" targeting "some of the most committed saints" who resisted the administration's ideological agenda.

108. That ideological agenda preferred white, mainland leadership aka "real" leadership and authority when compared to the token leadership afforded members of Plaintiffs race and communities.

109. Sadly, BYU-Hawaii's values, even Church doctrine took a back seat to maintaining cultural superiority and power over those who share Plaintiffs racial and cultural heritage, deeply harming them and causing their community not to trust BYU-Hawaii leadership.

110. Plaintiffs were not the only members of their race and community to experience: fabricated allegations, refusal to engage in any dialogue or progressive discipline (contrary to university policy), and, retaliation against employees who were culturally connected to the student body and community.

111. BYU-Hawaii prefers mainland-style metrics, leadership and control over culturally relevant Pacific/Asian approaches (despite the stated mission of the school) and leaders like Plaintiffs, thereby further alienating local staff and students.

112. The pretextual nature of Defendant's stated reasons for Plaintiffs' terminations are demonstrated by the fact that they are directly contradicted by Plaintiffs' documented performance history, including positive reviews, awards, bonuses, and salary increases.

113. The pretextual nature of Defendant's stated reasons for Plaintiffs' terminations are further demonstrated by the fact that BYU-Hawaii failed to follow its own progressive discipline procedures, failed to provide performance metrics or goals despite Plaintiffs' requests, and failed to counsel or warn Plaintiffs prior to termination.

114. Upon information and belief, Plaintiffs' race and cultural background as Native Hawaiian and/or Pacific Islander were motivating factors in Defendant's decision to terminate their employment.

115. Upon information and belief, similarly situated employees who were not Native Hawaiian or Pacific Islander were treated more favorably than Plaintiffs and were not subjected to termination under similar circumstances.

116. Upon information and belief, non-Native Hawaiian and non-Pacific Islander employees with similar or inferior performance records were retained by BYU-Hawaii and were provided with counseling, warnings, and opportunities to improve, which Plaintiffs were denied.

117. Upon information and belief, BYU-Hawaii has engaged in a pattern and practice of discriminating against Native Hawaiian and Pacific Islander employees in terms and conditions of employment, including termination decisions.

118. Defendant's discriminatory conduct was intentional, willful, and in reckless disregard of Plaintiffs' federally protected rights.

119. Defendant's conduct demonstrates a callous indifference to Plaintiffs' rights under Title VII.

120. As a direct and proximate result of Defendant's race discrimination in violation of Title VII, Plaintiffs have suffered and continue to suffer economic and non-economic damages as described herein.

121. Defendant's conduct warrants an award of compensatory and punitive damages pursuant to 42 U.S.C. § 1981a.

**SECOND CAUSE OF ACTION**
**Age Discrimination in Violation of the Age Discrimination in Employment Act**
**29 U.S.C. § 621 et seq.**
**(On Behalf of both Plaintiffs)**

122. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

123. The Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., prohibits employers from discriminating against employees who are forty (40) years of age or older.

124. Specifically, the ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

125. Both Plaintiffs were over the age of forty (40) at the time of their terminations and at all times relevant to this Complaint.

126. Plaintiffs' age was known to BYU-Hawaii and to the supervisors and decision-makers involved in their terminations.

127. Plaintiffs were qualified for their positions and were performing their jobs in an exemplary manner, as evidenced by consistently positive performance reviews, awards, bonuses, salary increases, and other recognition.

128. Despite their exemplary performance and qualifications, Plaintiffs were terminated from their employment.

129. Defendant's stated reasons for Plaintiffs' terminations—alleged performance deficiencies—were pretextual and designed to conceal the true, discriminatory reasons for their terminations.

130. The pretextual nature of Defendant's stated reasons is demonstrated by the fact that they are directly contradicted by Plaintiffs' documented performance history.

131. Upon information and belief, Plaintiffs' age was a motivating factor in Defendant's decision to terminate their employment.

132. Upon information and belief, BYU-Hawaii sought to replace Plaintiffs with younger employees who would command lower salaries and benefits.

133. Upon information and belief, similarly situated younger employees were treated more favorably than Plaintiffs and were not subjected to termination under similar circumstances.

134. Upon information and belief, younger employees with similar or inferior performance records were retained by BYU-Hawaii and were provided with counseling, warnings, and opportunities to improve, which Plaintiffs were denied.

135. The fact that Plaintiffs were terminated shortly after receiving raises, bonuses, and other benefits suggests that BYU-Hawaii sought to avoid the continued financial obligations associated with older, more experienced employees.

136. Defendant's discriminatory conduct was willful and in reckless disregard of Plaintiffs' federally protected rights under the ADEA.

137. Defendant knew or showed reckless disregard for the matter of whether its conduct violated the ADEA.

138. As a direct and proximate result of Defendant's age discrimination in violation of the ADEA, Plaintiffs have suffered and continue to suffer economic and non-economic damages as described herein.

139. Defendant's willful conduct warrants an award of liquidated damages pursuant to 29 U.S.C. § 626(b), which provides for liquidated damages in an amount equal to the compensatory damages in cases of willful violations.

**THIRD CAUSE OF ACTION**
**Wrongful Termination in Violation of Hawaii Revised Statutes § 378-2**
**(On Behalf of Both Plaintiffs)**

140. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

141. Hawaii Revised Statutes § 378-2 prohibits employers from discriminating against employees on the basis of race, sex, including gender identity or expression, sexual orientation, age, religion, color, ancestry, disability, marital status, arrest and court record, or domestic or sexual violence victim status.

142. Specifically, HRS § 378-2(a)(1) provides that it is unlawful discriminatory practice:
"(1) For any employer to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment because of race, sex, including gender identity or expression, sexual orientation, age, religion, color, ancestry, disability, marital status, arrest and court record, or domestic or sexual violence victim status if the individual is a victim of domestic or sexual violence and the individual's employer was notified of such status or the employer had actual knowledge of such status."

143. Plaintiffs are members of multiple protected classes under HRS § 378-2, including race (Native Hawaiian and/or Pacific Islander), ancestry (Native Hawaiian and/or Pacific Islander), and age (over 40).

144. Defendant discriminated against Plaintiffs on the basis of their protected characteristics in violation of HRS § 378-2.

145. Defendant's discriminatory conduct included terminating Plaintiffs from their employment based on their race, ancestry, and age.

146. Defendant's stated reasons for terminating Plaintiffs were pretextual and were designed to mask the true, discriminatory reasons.

147. The pretextual nature of Defendant's stated reasons is evidenced by the contradictions between those reasons and Plaintiffs' documented exemplary performance.

148. Defendant's discriminatory conduct was intentional and willful.

149. Upon information and belief, similarly situated employees who were not members of Plaintiffs' protected classes were treated more favorably and were not subjected to termination under similar circumstances.

150. Hawaii law recognizes that discrimination based on race, ancestry, and age is particularly harmful to Native Hawaiian and Pacific Islander communities and to older workers who face unique challenges in the job market.

151. As a direct and proximate result of Defendant's violations of HRS § 378-2, Plaintiffs have suffered and are suffering economic and non-economic damages as described herein.

152. Plaintiffs are entitled to all remedies available under Hawaii law for violations of HRS § 378-2, including compensatory damages, punitive damages, and attorney's fees costs.

**FOURTH CAUSE OF ACTION**
**Breach of Implied Contract**
**(On Behalf of Both Plaintiffs)**

153. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

154. Hawaii law recognizes that an implied contract can be created through an employer's policies, procedures, employee handbooks, and oral representations.

155. Defendant maintained written policies, procedures, and employee handbooks governing employee discipline and termination that were provided to Plaintiffs and were available to all BYU-Hawaii employees.

156. Defendant's policies and procedures established a progressive disciplinary process that included specific steps to be followed before an employee could be terminated for performance-related reasons.

157. Defendant's progressive disciplinary procedures included:

a. Verbal counseling sessions with documentation;
b. Written warnings specifying performance deficiencies and providing opportunity for improvement;
c. Additional warnings if performance did not improve;
d. Probation periods with clear performance goals and timelines;
e. Consideration of lateral reassignments to positions better suited to the employee's skills;
f. Termination only after all previous steps had been exhausted.

158. Defendant's policies and procedures were set forth in written employee handbooks and policy manuals and were communicated to employees, including Plaintiffs, as the standards and procedures that would govern their employment.

159. Through its written policies, procedures, handbooks, and oral representations by supervisors and management, Defendant created an implied contract with Plaintiffs governing the terms and conditions of their employment, including the procedures that would be followed in the event of alleged performance deficiencies.

160. Plaintiffs were aware of and relied upon Defendant's policies and procedures throughout their employment.

161. Plaintiffs accepted and performed under the terms of this implied contract by providing loyal, dedicated, and exemplary service to Defendant for eight and nine years respectively.

162. Plaintiffs fulfilled all obligations under the implied contract, as evidenced by their consistently positive performance reviews, awards, bonuses, and salary increases.

163. Plaintiffs reasonably expected that Defendant would follow its own policies and procedures in all employment matters, including discipline and termination.

164. Plaintiffs relied on Defendant's policies and procedures in making decisions about their employment, including their decisions to remain employed at BYU-Hawaii rather than seeking other employment opportunities.

165. Defendant breached the implied contract by terminating Plaintiffs without following its own established policies and procedures.

166. Defendant provided no verbal counseling sessions to Plaintiffs prior to termination.

167. Defendant provided no written warnings to Plaintiffs specifying alleged performance deficiencies or providing opportunities for improvement.

168. Defendant did not place Plaintiffs on probation or provide them with clear performance goals and timelines for improvement.

169. Defendant did not engage in discussions with Plaintiffs regarding lateral reassignments to other positions.

170. Defendant terminated Plaintiffs without exhausting any of the progressive disciplinary steps set forth in its own policies and procedures.

171. Defendant's failure to follow its own policies and procedures was deliberate and intentional.

172. Defendant's deliberate failure to follow its policies and procedures was intended to avoid creating a documented record that would reveal the true, discriminatory reasons for Plaintiffs' terminations.

173. Had Defendant followed its progressive disciplinary procedures, Plaintiffs would have been provided with notice of alleged performance deficiencies, specific goals for improvement, and opportunities to remedy any alleged issues—none of which occurred.

174. Had Defendant followed its progressive disciplinary procedures, the pretextual nature of the alleged performance deficiencies would have been exposed, as Plaintiffs' performance was in fact exemplary.

175. Defendant's breach of the implied contract deprived Plaintiffs of the procedural protections they were promised and to which they were entitled.

176. As a direct and proximate result of Defendant's breach of the implied contract, Plaintiffs have suffered and continue to suffer economic and non-economic damages as described herein.

177. Plaintiffs are entitled to damages for lost wages, benefits, and other compensation they would have received had Defendant honored the implied contract and followed its progressive disciplinary procedures.

**FIFTH CAUSE OF ACTION**
**Breach of Implied Covenant of Good Faith and Fair Dealing**
**(On Behalf of Both Plaintiffs)**

178. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

179. Under Hawaii law, every contract, including employment contracts, contains an implied covenant of good faith and fair dealing.

180. The implied covenant of good faith and fair dealing requires that neither party do anything that will injure the right of the other party to receive the benefits of the agreement.

181. The implied covenant of good faith and fair dealing prohibits a party from acting in bad faith to frustrate the other party's right to receive the benefits of the contract.

182. The existence of an employment relationship between Plaintiffs and Defendant created a contractual relationship governed by the implied covenant of good faith and fair dealing.

183. Plaintiffs performed their employment obligations with exemplary dedication, loyalty, and professionalism for eight and nine years respectively.

184. Plaintiffs fulfilled all of their obligations under the employment relationship and were entitled to the benefits of that relationship, including fair treatment, honest dealing, job security based on performance, and adherence to established policies and procedures.

185. Defendant breached the implied covenant of good faith and fair dealing through the following conduct:

a. Terminating Plaintiffs for unlawful, discriminatory reasons based on race, ancestry, and age;
b. Fabricating pretextual, false performance-based reasons for termination to conceal the true discriminatory motivations;
c. Deliberately failing to follow established policies and procedures in order to avoid creating documentation that would reveal the discriminatory nature of the terminations;
d. Refusing to provide Plaintiffs with performance metrics, goals, or clear expectations despite Plaintiffs' repeated requests, thereby making it impossible for Plaintiffs to address alleged deficiencies;
e. Terminating Plaintiffs without warning despite years of documented excellent performance;
f. Terminating Plaintiffs shortly after providing them with raises, bonuses, awards, housing, and advocacy for promotions, creating a false sense of security;
g. Making false representations to Plaintiffs that they would be able to retire from BYU-Hawaii, inducing Plaintiffs' continued service and reliance;
h. Acting in bad faith and with dishonesty regarding the reasons for termination;

i. Treating Plaintiffs unfairly and differently from similarly situated employees who were not members of Plaintiffs' protected classes;
j. Acting with the intent to deprive Plaintiffs of the benefits of their employment relationship.

186. Defendant's conduct was undertaken in bad faith and with the intent to injure Plaintiffs' rights to receive the benefits of their employment.

187. Defendant's conduct deprived Plaintiffs of the benefits of their employment, including:
a. Job security and continued employment;
b. The ability to retire from BYU-Hawaii as they had been led to expect;
c. Fair treatment and honest dealing from their employer;
d. Adherence to established policies and procedures;
e. Notice and opportunity to address alleged performance deficiencies;
f. Professional reputation and standing;
g. The economic benefits of continued employment, including salary, benefits, and retirement contributions.

187. Defendant's breach of the implied covenant of good faith and fair dealing was committed in bad faith, arbitrarily, capriciously, and without probable cause.

188. Hawaii courts recognize that the implied covenant of good faith and fair dealing is particularly important in the employment context, where employees are vulnerable to arbitrary and unfair treatment by employers who hold superior bargaining power.

189. Defendant's breach was especially egregious given Plaintiffs' long tenure, exemplary performance, and the false assurances they were given about their future with BYU-Hawaii.

190. As a direct and proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiffs have suffered and continue to suffer economic and non-economic damages as described herein.

191. Defendant's breach of the implied covenant of good faith and fair dealing was done with malice and in reckless disregard of Plaintiffs' rights, warranting an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**Intentional Infliction of Emotional Distress**
**(On Behalf of Both Plaintiffs)**

192. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

193. Under Hawaii law, a claim for intentional infliction of emotional distress requires: (1) that the defendant's conduct was intentional or reckless; (2) that the conduct was outrageous; and (3) that the conduct caused (4) extreme emotional distress to the plaintiff.

194. Defendant's conduct toward Plaintiffs was intentional and reckless.

195. Defendant's conduct was extreme and outrageous and exceeded all bounds of decency tolerated in a civilized society.

196. Defendant's conduct was of a nature that is especially calculated to cause, and does cause, mental distress.

197. Defendant's extreme and outrageous conduct included:

a. Terminating dedicated, exemplary employees without warning after eight and nine years of loyal, outstanding service;

b. Fabricating false, pretextual performance-based reasons to conceal unlawful racial and age discrimination;

c. Deliberately ignoring established policies and procedures to avoid creating documentation that would expose the discriminatory nature of the terminations;

d. Terminating Plaintiffs shortly after awarding them significant raises, bonuses, prestigious awards, housing benefits, and advocating for their promotions, thereby creating a false sense of security and making the terminations even more shocking and devastating;

e. Making false assurances to Plaintiffs that they would be able to retire from BYU-Hawaii, inducing Plaintiffs to remain employed and make life decisions in reliance on those assurances, only to abruptly terminate them;

f. Refusing to provide Plaintiffs with performance metrics or clear expectations despite their repeated requests, making it impossible for Plaintiffs to address alleged

deficiencies, and then using fabricated performance deficiencies as the basis for termination;

g. Acting with dishonesty and bad faith in communications with Plaintiffs regarding the reasons for their terminations, providing inconsistent and contradictory explanations;

h. Treating Plaintiffs, who are highly regarded members of the Native Hawaiian and Pacific Islander communities, in a manner that was disrespectful, dishonest, and contrary to the values BYU-Hawaii publicly espouses;

i. Discriminating against Plaintiffs based on their race, ancestry, and age in violation of fundamental civil rights;

j. Engaging in conduct designed to humiliate and degrade Plaintiffs in their communities and professions.

198. Defendant engaged in this conduct intentionally, knowing that it would cause severe emotional distress to Plaintiffs, or with reckless disregard for the probability that Plaintiffs would suffer severe emotional distress.

199. Defendant knew or should have known that Plaintiffs, as long-term employees who had been repeatedly praised, rewarded, and assured of their value to BYU-Hawaii, would suffer severe emotional distress from sudden, unexpected termination based on fabricated reasons that contradicted their documented exemplary performance.

200. Defendant knew or should have known that terminating Plaintiffs shortly after providing them with raises, bonuses, awards, housing, and advocacy for promotions would be especially traumatic and would cause severe emotional distress.

201. Defendant knew or should have known that as highly regarded members of the Native Hawaiian and Pacific Islander communities, Plaintiffs would suffer particular harm to their reputations and standing from being terminated under false pretenses.

202. Defendant's conduct was undertaken with the intent to cause emotional distress or with reckless disregard for the certainty that emotional distress would result.

203. As a direct and proximate result of Defendant's extreme and outrageous conduct, Plaintiffs have suffered and continue to suffer severe emotional distress.

204. The emotional distress suffered by Plaintiffs includes:

a. Severe humiliation and embarrassment in their professional and personal communities;
b. Profound anxiety and worry about their financial futures and ability to provide for their families;
c. Loss of self-esteem and confidence;
d. Depression and feelings of worthlessness;
e. Anger and betrayal at being treated dishonestly and unfairly after years of dedicated service;
f. Stress and anxiety about finding new employment;
g. Sleep disturbances and other physical manifestations of emotional distress;
h. Damage to family relationships due to the stress and financial hardship caused by the terminations;
i. Loss of trust in institutions and employers;
j. Feelings of being targeted and discriminated against because of their race and age.

205. Plaintiffs' emotional distress is severe and is of a nature that no reasonable person could be expected to endure it.

206. Plaintiffs' emotional distress has manifested in physical and psychological symptoms requiring medical attention and treatment.

207. The severity of Plaintiffs' emotional distress is demonstrated by the fact that it has interfered with their daily activities, relationships, and ability to function normally.

208. Plaintiffs' emotional distress is ongoing and continues to this day, and will likely continue into the future.

209. The fact that Plaintiffs were blindsided by their terminations—coming without warning and shortly after receiving raises, bonuses, awards, and assurances of their value—has made the emotional distress particularly severe.

210. The fact that Plaintiffs were assured they could retire from BYU-Hawaii and made life decisions in reliance on those assurances has exacerbated the emotional distress caused by their sudden terminations.

211. As highly regarded members of their communities, Plaintiffs have suffered particular emotional distress from the damage to their reputations and the loss of trust from community members who may believe the false, pretextual reasons given for their terminations.

212. Defendant's conduct caused severe and ongoing emotional and physical harm, including anxiety, depression, stress-related medical conditions, and loss of professional identity. Plaintiff also experienced prolonged disruption to family stability and was forced to relocate while unable to secure comparable employment.

213. These emotional, non-pecuniary personal damages will be proven at trial but in an amount no less than: $3,000,000.00

214. Defendant's conduct in terminating Plaintiffs for discriminatory reasons based on race and age has caused Plaintiffs to feel devalued, marginalized, and targeted because of their identity as Native Hawaiian and/or Pacific Islander individuals over the age of 40.

## SEVENTH CAUSE OF ACTION
## Negligent Infliction of Emotional Distress
## (On Behalf of Both Plaintiffs)

215. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

216. Plaintiffs alleged that BYU-Hawai'i's conduct was intentional, most certainly reckless and grossly negligent in its affect upon the Plaintiff; that it was outrageous; and that same conduct caused emotional distress to the Plaintiffs.

217. Defendant's conduct toward Plaintiffs was intentional and reckless.

218. Defendant's outrageous conduct exceeded all bounds of decency tolerated in a civilized society, was more harmful given the sensitivities of the community in which Plaintiffs live and worked for Defendant.

219. Defendant's conduct was of a nature that is especially calculated to cause, and does cause, mental distress, and undermine these Plaintiffs personally and professionally in their communities.

220. Defendant's extreme and outrageous conduct included:

a. Terminating dedicated, exemplary employees without warning after eight and nine years of loyal, outstanding service;

b. Fabricating false, pretextual performance-based reasons to conceal unlawful racial and age discrimination;

c. Deliberately ignoring established policies and procedures to avoid creating documentation that would expose the discriminatory nature of the terminations;

d. Terminating Plaintiffs shortly after awarding them significant raises, bonuses, prestigious awards, housing benefits, and advocating for their promotions, thereby creating a false sense of security and making the terminations even more shocking and devastating;

e. Making false assurances to Plaintiffs that they would be able to retire from BYU-Hawaii, inducing Plaintiffs to remain employed and make life decisions in reliance on those assurances, only to abruptly terminate them;

f. Refusing to provide Plaintiffs with performance metrics or clear expectations despite their repeated requests, making it impossible for Plaintiffs to address alleged deficiencies, and then using fabricated performance deficiencies as the basis for termination;

g. Acting with dishonesty and bad faith in communications with Plaintiffs regarding the reasons for their terminations, providing inconsistent and contradictory explanations;

h. Treating Plaintiffs, who are highly regarded members of the Native Hawaiian and Pacific Islander communities, in a manner that was disrespectful, dishonest, and contrary to the values BYU-Hawai'i publicly espouses;

i. Discriminating against Plaintiffs based on their race, ancestry, and age in violation of fundamental civil rights;

j. Engaging in conduct designed to humiliate and degrade Plaintiffs in their communities and professions.

221. Defendant engaged in this conduct intentionally, or at best with recklessness and should have known that it would cause severe emotional distress to Plaintiffs, or with reckless disregard for the probability that Plaintiffs would suffer severe emotional distress.

222. Defendant knew or should have known that Plaintiffs, as long-term employees who had been repeatedly praised, rewarded, and assured of their value to BYU-HawaiIi, would suffer severe emotional distress from sudden, unexpected termination based on fabricated reasons that contradicted their documented exemplary performance.

223. Defendant knew or should have known that terminating Plaintiffs shortly after providing them with raises, bonuses, awards, housing, and advocacy for promotions would be especially traumatic and would cause severe emotional distress.

224. Defendant knew or should have known that as highly regarded members of the Native Hawaiian and Pacific Islander communities, Plaintiffs would suffer particular harm to their reputations and standing from being terminated under false pretenses.

225. Defendant's conduct was undertaken with the intent to cause emotional distress or with reckless disregard for the certainty that emotional distress would result.

226. As a direct and proximate result of Defendant's extreme and outrageous conduct, Plaintiffs have suffered and continue to suffer severe emotional distress.

227. The emotional distress suffered by Plaintiffs includes:

a. Severe humiliation and embarrassment in their professional and personal communities;
b. Profound anxiety and worry about their financial futures and ability to provide for their families;

c. Loss of self-esteem and confidence;
d. Depression and feelings of worthlessness;
e. Anger and betrayal at being treated dishonestly and unfairly after years of dedicated service;
f. Stress and anxiety about finding new employment;
g. Sleep disturbances and other physical manifestations of emotional distress;
h. Damage to family relationships due to the stress and financial hardship caused by the terminations;
i. Loss of trust in institutions and employers;
j. Feelings of being targeted and discriminated against because of their race and age.

228. Plaintiffs' emotional distress is severe and is of a nature that no reasonable person could be expected to endure it.

229. Plaintiffs' emotional distress has manifested in physical and psychological symptoms requiring medical attention and treatment.

230. The severity of Plaintiffs' emotional distress is demonstrated by the fact that it has interfered with their daily activities, relationships, and ability to function normally.

231. Plaintiffs' emotional distress is ongoing and continues to this day and will likely continue into the future.

232. The fact that Plaintiffs were blindsided by their terminations—coming without warning and shortly after receiving raises, bonuses, awards, and assurances of their value—has made the emotional distress particularly severe.

233. The fact that Plaintiffs were assured they could retire from BYU-Hawai'i and made life decisions in reliance on those assurances has exacerbated the emotional distress caused by their sudden terminations.

234. As highly regarded members of their communities, Plaintiffs have suffered particular emotional distress from the damage to their reputations and the loss of trust from community members who may believe the false, pretextual reasons given for their terminations.

235. Defendant’s conduct caused severe and ongoing emotional and physical harm, including anxiety, depression, stress-related medical conditions, and loss of professional identity. Plaintiff also experienced prolonged disruption to family stability and was forced to relocate while unable to secure comparable employment.

236. These emotional, non-pecuniary personal damages will be proven at trial but in an amount no less than $3,000,000.00 for each Plaintiff.

237. Defendant's conduct in terminating Plaintiffs for discriminatory reasons based on race and age has caused Plaintiffs to feel devalued, marginalized, and targeted because of their identity as Native Hawaiian and/or Pacific Islander individuals over the age of 40.

**EIGHTH CAUSE OF ACTION**
**Defamation**
**(On Behalf of Both Plaintiffs)**

238. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

239. That BYU-Hawai’i, by its agents serving as the leadership responsible for the Plaintiffs illegal and discriminatory terminations did undertake their actions, make false and negative statements harmful to the Plaintiffs at the behest of BYU-Hawai’i to harm Plaintiffs, weaken them in their communities by destroying their reputations.

240. That prior to the filing of this action, as part of their effort to cover up and conceal their illegal and discriminatory conduct, BYU-Hawai’i and its agents intentionally falsified the basis for their terminations, repeating these false and defamatory claims inside and outside of BYU-Hawai’i to harm them in their personal and professional communities.

241. Plaintiffs have been damaged in the community where the allegations were made and their professional and personal standing(s) has been permanently impaired.

242. That BYU-Hawai'i did act with malicious intent and actual knowledge of the falsity of their allegations and did and continue to publish them to third parties that Plaintiffs were less than competent, were untrustworthy, had failed in their respective roles, had "self-dealt" or diverted BYU-Hawai'i resources to benefit themselves, or, generally, that they were terminated for reasons related to honesty and integrity (which within the world of BYU-Hawai'i and the attendant honor code is devastating).

243. That these false and defamatory statements were made as part of a personal attack upon Plaintiffs with the intent to destroy their credibility, their reputations in the community during the pendency of this dispute and while they attempted to find alternate employment.

244. These false allegations were calculated and made with the specific intent to defame, embarrass and annoy Plaintiffs. Further, they are allegations of immoral character in that Plaintiffs sought to benefit themselves personally by abusing their positions of leadership; that they were incapable of leadership at the highest levels; that they had failed in their roles; failed to meet expectations expressed and were effectively fired for cause – for their personal failures – all patently untrue.

245. Plaintiffs have suffered significant reputational damage due to false statements, improper disclosures, and breaches of confidentiality by BYU-Hawai'i and its agents. This conduct impaired Plaintiff's professional standing and future employment opportunities.

246. Plaintiffs both demand correction of personnel records, a formal statement clearing their names, and, acknowledgment of wrongdoing by BYU-Hawai'i.

247. Plaintiff's each seek direct damages for Defamation as follows: $5,000,000.00 for Mr. Kalama; $5,000,000.00 for Mr. Maiava for a total of $10,000,000.00.

248. In addition, to the extent allowed under federal law or the laws of the state of Hawaii', Plaintiffs collectively seek punitive damages in the amount of $30,000,000.00 based on Defendant's willful, malicious, and/or reckless disregard of Plaintiff's rights.

249. The cumulative evidence referenced above show intentional misconduct, including unlawful termination practices, disregard of legal obligations and improper institutional conduct by BYU-Hawai'i harmful to the very communities it exists to serve.

250. Punitive damages are necessary to deter similar conduct by BYU-Hawai'i and its agent ever again and to ensure accountability to these Plaintiffs and their racial and ancestral communities.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Kenneth A. Kalama and Edward Maiava, Jr. respectfully request that this Court enter judgment in their favor and against Defendant Brigham Young University-Hawai'i, and award Plaintiffs the following relief:

1. A declaration that Defendant violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., by discriminating against Plaintiffs on the basis of their race and national origin;

2. A declaration that Defendant violated the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., by discriminating against Mr. Maiava on the basis of his age;

3. A declaration that Defendant violated Hawaii Revised Statutes § 378-2 by discriminating against Plaintiffs on the basis of their race, ancestry, and age;

4. Compensatory damages for past economic losses, including: a. Lost wages and salary from the date of termination to the present; b. Lost benefits, including health insurance, retirement contributions, and other employee benefits; c. Loss of BYU-Hawai'i housing

benefits (as to Mr. Maiava); d. Out-of-pocket expenses incurred as a result of the terminations; e. Other economic losses;

5. Compensatory damages for future economic losses, including: a. Lost future wages and salary; b. Lost future benefits, including retirement contributions; c. Loss of future earning capacity; d. Other future economic losses;

6. Compensatory damages for past and future non-economic losses, including: a. Emotional distress, humiliation, and mental anguish; b. Loss of reputation and professional standing; c. Damage to personal and professional relationships; d. Loss of enjoyment of life; e. Anxiety, depression, and other psychological harm; f. Physical manifestations of emotional distress; g. Other non-economic damages;

7. Punitive damages in an amount sufficient to punish Defendant for its willful, malicious, and reckless conduct and to deter Defendant and other employers from engaging in similar discriminatory conduct in the future, pursuant to 42 U.S.C. § 1981a and Hawai'i law;

8. Liquidated damages in an amount equal to the compensatory damages awarded for Defendant's willful violation of the Age Discrimination in Employment Act, pursuant to 29 U.S.C. § 626(b);

9. Pre-judgment interest on all damages from the date of accrual to the date of judgment, at the maximum rate allowed by law;

10. Post-judgment interest on all damages from the date of judgment until paid in full, at the maximum rate allowed by law;

11. Reasonable attorneys' fees and costs incurred in prosecuting this action, pursuant to 42 U.S.C. § 2000e-5(k) (Title VII), 29 U.S.C. § 216(b) (ADEA), Hawai'i Revised Statutes § 378-5, and other applicable law;

12. Such other and further relief as this Court deems just, proper, and equitable under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

**RESERVATION**

Plaintiffs reserve the right to further amend their position statement and accompanying documents.

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

DATED: HALEIWA, HI May 8, 2026.

ANN K. OTTEMAN
Attorney for Plaintiffs

**EXHIBIT "A"**

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Honolulu Local Office**
300 Ala Moana Blvd, Room 4-257
Honolulu, HI 96850
(808) 800-2350
Website: www.eeoc.gov

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 02/17/2026

**To:** Mr. Kenneth A. Kalama
55-551 Moana St.
Laie, HI 96762

Charge No: 486-2025-00206

EEOC Representative and email: KRIS KAOPUIKI
INVESTIGATOR
KRIS.KAOPUIKI@EEOC.GOV

---

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

The EEOC has granted your request for a Notice of Right to Sue, and more than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 486-2025-00206.

On behalf of the Commission,

Digitally Signed By:Juan Serrata
02/17/2026

Juan Serrata
Acting Director

**Cc:**
Incident Location
BYU - Hawaii
BYU Hawaii #1969 55-220 Kulanui Street Building 5
Laie, HI 96762

NA NA
#1969 55-220 Kulanui Street Building 5
Laie, HI 96762

Christian Fox
Brigham Young University
A-357 ASB
Provo, UT 84602

Dave G Turcotte Esq.
Omnus Law
299 South Main Street Suite 1300
Salt Lake City, UT 84111

Please retain this Notice for your records.

# INFORMATION RELATED TO FILING SUIT UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court* ***under Federal law****. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to: https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a “FOIA Request” for Charge Number 486-2025-00206 to the District Director at Christine Park-Gonzalez, 255 East Temple St 4th Floor, Los Angeles, CA 90012.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a “Section 83 Request” for Charge Number 486-2025-00206 to the District Director at Christine Park-Gonzalez, 255 East Temple St 4th Floor, Los Angeles, CA 90012.

You may request the charge file up to 90 days after receiving EEOC’s official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

**EXHIBIT "B"**

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Honolulu Local Office**
300 Ala Moana Blvd, Room 4-257
Honolulu, HI 96850
(808) 800-2350
Website: www.eeoc.gov

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 02/17/2026

**To:** Mr. Edward Maiava Jr.
55-443B Naniloa Loop
Laie, HI 96762
Charge No: 486-2025-00205

EEOC Representative and email: KRIS KAOPUIKI
INVESTIGATOR
KRIS.KAOPUIKI@EEOC.GOV

---

### NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

The EEOC has granted your request for a Notice of Right to Sue, and more than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge. The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court WITHIN 90 DAYS of your receipt of the EEOC's official notice of dismissal. Otherwise, your right to sue based on the above-numbered charge will be lost.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 486-2025-00205.

On behalf of the Commission,

Digitally Signed By:Juan Serrata
02/17/2026

Juan Serrata
Acting Director

**Cc:**
NA NA
#1969 55-220 Kulanui Street Building 5
Laie, HI 96762

Incident Location
BYU - Hawaii
BYU Hawaii #1969 55-220 Kulanui Street Building 5
Laie, HI 96762

Christian Fox
Brigham Young University
A-357 ASB
Provo, UT 84602

Dave G Turcotte Esq.
Omnus Law
299 South Main Street Suite 1300
Salt Lake City, UT 84111

Please retain this Notice for your records.

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a “FOIA Request” for Charge Number 486-2025-00205 to the District Director at Christine Park-Gonzalez, 255 East Temple St 4th Floor, Los Angeles, CA 90012.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a “Section 83 Request” for Charge Number 486-2025-00205 to the District Director at Christine Park-Gonzalez, 255 East Temple St 4th Floor, Los Angeles, CA 90012.

You may request the charge file up to 90 days after receiving EEOC’s official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.